In 2014, the Cape Girardeau County Jail began banning all personal letters to inmates in favor of plain white postcards. This included the appellant's letters to her incarcerated son there. There is no dispute that this infringed on Mrs. Simpson's First Amendment free speech rights, and since the case involves a jail policy that abridges a fundamental constitutional right, it is governed by the case Turner v. Safley. The District Court recognized that, but it erred in two ways. First, it abused its discretion by excluding as irrelevant the very evidence that Turner tells us is relevant, that is, what other correctional facilities do on a particular issue, in this case, inmate mail. And it also ignored the evidence as it came in in trial in favor of what it saw as a logical connection between the restriction and its stated goals, which disregards a clear directive from the Supreme Court in the case Beard v. Banks, which requires jails to show more than a formalistic, logical connection between a restriction and its goal. Turning to the first issue, it was clearly an abuse of discretion for the court to exclude this evidence because Turner itself relies on the same evidence. We lost. Judge Loken. Hello. Yes. Okay. Got you back. You got me back. I don't know why it cut off. Okay. All right, you may resume. Yes, Your Honor. I was talking about issue number one on appeal, which is concerning the District Court's improper exclusion of other correctional facilities policies on inmate mail. This was a prejudicial exclusion of evidence because the court not only ultimately ruled against Mrs. Simpson, but ruled against her on each of the factors that this evidence would have gone to, including what easy alternatives there were to the jail and what kind of ripple effect there would have been in starting one of these policies instead. The Bureau of Corrections, the Missouri Department of Corrections, and the 10 county jails whose authenticated mail policies Mrs. Simpson proffered all allow letters to inmates. Mrs. Simpson couldn't. Counsel, I can't hear you. Can you hear me now, Your Honor? Yes, much better. Sorry about that. Mrs. Simpson wasn't able to elicit testimony on how the Department of Corrections policy, the Bureau of Prisons policy, or any of the other county jail policies could have been adapted in Cape Girardeau with minimal cost to that jail. Have you pointed out in your brief or elsewhere in what respects this evidence would have helped you had it been admitted? Have you said, well, XYZ is a feature of Prison A and not of this one, and that this would have worked just as well? Yes, Your Honor. So the issue of the policies was briefed in a motion in limine before the court. And in that motion, we discussed how the evidence would help Mrs. Simpson, i.e., the Bureau of Prisons, for example, allows letters. It separates the inspection process and the reading process so there isn't so much administrative burden on the prison staff. And if inmates abuse that privilege, they restrict those prisoners from receiving letters from everybody in the world to just immediate family members. So we talked about the relevance of that evidence and the fact that the Turner Court itself relied precisely on the same BOP policy when we briefed that motion in limine. Does that litany of reasons appear in your appellate brief? You mean how the policies would have helped Mrs. Simpson? Yes. I think it does, Your Honor. We talked about how the jail didn't even consider any alternative before banning letters completely. Well, here you're talking about the Bureau of Prison Policies, Missouri Department of Corrections, et cetera. And let me just suggest this and see what you think, that the exclusion of all that really is not particularly prejudicial because all of those processes and procedures were not materially different from the previous Cape Girardeau policies. In other words, I'm suggesting that the court already had, by looking at and thinking about the policies that had previously been in effect, it already had before it essentially the suggested alternatives. What do you think about that? I think that was the court's rationale, but I don't think that is correct. The Cape Girardeau County Jail didn't offer any evidence about, for example, separating the reading process and inspection process or having specialized staff that looked at just mail processing issues or how it delivered the mail or anything like that that would have made those policies irrelevant to the court's determination. And the Turner case involved, as you know, the Turner case involved the Missouri Department of Corrections and the Turner court itself found the Bureau of Prisons policy relevant to the Department of Corrections, even though they were obviously at different levels of prison. Turning to the second issue on appeal, the district court did identify Turner correctly as the governing standard, but then it applied it incorrectly. Now, Turner, this case involves an action by a non-prisoner, right, who wants to send mail into the prison, but Turner involved the rights of inmates. Yes, Your Honor. Does that make any difference? The only difference it would make is to make the non-incarcerated person's first amendment right less able to be restricted. There's some... One case would support that notion. That the non-incarcerated person has a broader first amendment right? Well, it has a different say in a prison procedures case. Well, if you look at Turner itself, that involved communication among different parties. If you look at Beard v. Banks, for example, the 2006 case, that involved magazine and newspaper publishers who wanted to send mail into... That doesn't... You were saying that it matters legally. I was saying what case would say that? I would guess none. Your Honor, there are lots of first amendment cases that involve non-incarcerated persons, and the government isn't permitted to infringe on the rights of non-incarcerated persons to the extent that it can in a Turner case. So if Turner applies here, the government can do more to infringe that right than it could if it involved solely a non-incarcerated person. But that would be the most restrictions that the government could put on free speech rights. There's no case that says a non-incarcerated person has less free speech than an incarcerated person should. Does that answer your question, Judge Loken? Well, yes, but let me go back to something else. Barring mail to inmates would be the... There's protection against contraband being smuggled into the prison that way. So now we have... They've come up with the staff opening mail as a less restrictive alternative that has passed muster. Well, postcards are another less restrictive way that is less expensive. The staff will view individually. It seems to me the least restrictive alternative is not required in this wing of First Amendment law. So why isn't that enough? We still have alternative communications.  So why does the First Amendment include on this question? Your Honor, that is true, that nothing requires the jail to pick the least restrictive alternative. But the district court here had a duty to confirm that the jail wasn't, quote, exaggeratedly responding to a security concern, and the court didn't do that. Affirming the district court here would allow jails to ban all mail. And that is clearly not what this court intended. That's not true. Counsel, come on. That's not right. I think it is right, Your Honor. There's all kinds of protections built in here that your client just considers them too minimal. Your Honor, I don't think the evidence at trial showed that the jail had any legitimate concern to which it was responding in banning all personal letters to inmates. And the district court didn't analyze whether the jail was responding in an exaggerated way to its professed concern about contraband. So you're saying prison costs are irrelevant under the First Amendment analysis? No, Your Honor, I'm not saying that. I'm saying that the district court ignored the fact that there were no increased costs to the jail before this policy was implemented. The jail had an opportunity to show that there had been increased costs, but it didn't. The evidence at trial showed that the jail didn't save any time by going to a just postcard only system. It didn't change the number of staff people it had. It didn't have a reduced volume in the number of pieces of mail that came in. And it didn't have any difference in the amount of contraband that went into the jail. We had five years of contraband reports that showed that there had never been a prisoner who had been found with contraband in the jail when the letter policy was in effect. So what was the evidence that the district court cited in finding that this new policy does save time by allowing officers to check the mail faster? Your Honor, the court didn't. What it said is, quote, logic dictates, unquote, that the postcards would save time. It ignored the evidence and substituted its own judgment about a logical connection between time savings and limiting inmates to postcards only. So what you're suggesting, I guess, is that even if one might decide a case on the basis of presumption and common sense in the absence of evidence to the contrary, in your case you have evidence to the contrary. That's correct, Your Honor. And that's the only record evidence there is on the question. Yes, there is substantial evidence. That's your point. I mean, that's your position. Yes, Your Honor. There is substantial evidence showing that whatever benefits the jail thought it might reap from this policy, it didn't actually do that. And when there is evidence in the record to suggest that a jail is making an exaggerated response, the district court has a duty to underturn or to ensure that that's not what's happening, and it didn't do that here. Maybe there wasn't much contraband coming in before, and that's why under the old policy there wasn't much or any intercepted. But that doesn't mean that a jail or a warden has to bury his head in the sand and say, well, yeah, that was then, but this is now, and I have a reason to believe, just because I live in the world, that this is a problem that's increasing. And so I'm going to try this as a means of trying to snag more contraband that might otherwise come into the jail. Why is that not a logical consideration? Your Honor, I think that goes against what the per curiam panel at this court said in Williams v. Robinson, where it reinstated a pro se challenge to a postcard-only policy in Jackson County. And it cited cases where this court looked at the evidence that a particular jail or prison has to support its idea that some more restriction would be beneficial, including Murphy v. Missouri Department of Corrections. Both of those cases indicate that a court has a duty to look at the actual record and ensure that a jail isn't burdening constitutional rights in a way that doesn't have any benefit for that facility. I'm into my rebuttal time, so I will end here. May I please the court? The evidentiary issues that I think were briefly touched on by appellant can be easily dealt with. The court excluded the evidence basically on relevance. There was no offer ultimately as to how the other policies would be relevant to handling the Cape Girardeau County policy. In fact, they were just offered generally. And we have various prisons and county jails in southeast Missouri that, in fact, a couple of them have seven or eight inmates on a daily basis. Iron County or Oregon County were being offered. And there was no showing how these policies would have differed in any way than the Cape Girardeau County policy in effectuating something as an alternative to what the postcard policy that was being adopted by Cape Girardeau County. One of the issues in Turner is whether a change can be made for a de minimis cost. And one of the arguments just now was, well, you can add more staff to process these and look through them, and you can have more different people doing different jobs and corrections officers doing them. Cape Girardeau County Jail in the evidence was they have four corrections officers on duty at any shift for 200 plus inmates. And the evidence was also very clear as to all of the duties that these various four corrections officers have to do besides checking out the inmates, processing in people, processing out people, dealing with the public, court duties, food, medical, et cetera. And going through the mail is a laborious task. Is there any evidence that this policy reduced the amount of mail? Yes, sir. There was some evidence that we have had less mail coming in, and the postcards have been like maybe the same or less over the course of the time this policy was implemented, has been implemented. The same or less? Same or less. Yes, sir. But the time spent having to go through a postcard is in fact less and does not require going through each page of a letter, checking out for any type of contraband. That's certainly what common sense dictates there, but what was the testimony on that? The testimony was- That time was actually spent? There was not a defined time testified to by anyone. There was testimony by the two officers that the time has been less, and we've been able to free up jailers for more duties around the jail than in the past. There was no quantified time change that showed up. But in fact, the time has been reduced, and the contraband, we talk about certain types of- Yes, sir. The contraband that we were talking about was paperclips, staples, rubber bands, in addition to other types of things that could be in a jail, and that's a legitimate issue that any jail faces. One of the other issues that the judge had before her was the appellant's husband, Mr. Simpson, who was a corrections officer through Menard State Penitentiary in Chester, Illinois. He criticized our own policy before it was changed because the jailers did not remove the stamps from the envelopes, and he said, well, you can put drugs underneath these stamps, and they should be removed, and in Menard, they take the stamps off the letters. That's another process that you would have to go through. The postcards were required to be self-stamped, or they did take off the stamps, presumably, but those were issues that the judge heard, and she heard the fact that the Menard State Penitentiary allowed letters to come in. So I don't think the evidence issue is one that is prejudicial in this case by excluding the evidence from the trial. Beyond that, Judge Jackson heard the evidence. She heard the four factors. She applied the four factors to the evidence that both the appellant and the county put in, and she made a determination based on that evidence that the postcard policy passed muster. It did not infringe on the First Amendment rights of Ms. Simpson. She was still able to communicate, and there were other alternative issues for her, telephone, in-person visitation, and she utilized all these, and her family utilized these various things, and the judge did exclude some of the post-time that Mr. Simpson, her son, was in jail type of alternatives, but the jail has implemented more types of alternatives, including email and video conferencing. She did not go into that because it was not at the jail at the time. The basis of this is the judge found that the Turner factors applied. There was no infringement on the constitutional rights of Ms. Simpson and that the policy passed muster, and frankly, we would ask the court to affirm the judgment. It was not erroneous. It was not an abuse of discretion on limiting the evidence, and her decision should be upheld as it did meet constitutional muster as to the Supreme Court decisions and the cases following Turner v. Shaftway. We'd ask you to- Counsel, was this only a damage action? No, sir. There was, and it was a damage and basically an injunction action. Well, how can there be, how can Mr., when Trey Simpson is released the month before a very significant policy change regarding emails and photos, how was that factored into the injunction analysis? The judge did not factor in anything into the injunction analysis because he was released. He got down to damages. Did the plaintiff have standing for an injunction? At that point, no, sir. I don't believe the plaintiff had any standing. That was not raised and it was not an issue one way or the other. And what impact does the later change have on the damage claim? I mean, it shows this is a moving target, as we all know, policies invariably are. Correct. The damage claim was for postcards, cost of buying postcards as opposed to sending envelopes in. And then, of course, Ms. Simpson wanted the policy changed. But, you know, Mr. Simpson was out of jail, although he did go back into jail at a later date, but only on weekends and she didn't have any of the issues when he went back in on weekends that she had when he was there for a six-month period. Thank you. Thank you. Thank you, Your Honor. Thank you. All right, counsel, you have two minutes and four seconds. Counsel, we have a couple of cases, Herline and Murchison, that seem to hold that the prison may base its policies on administrators' reasonable assessment of potential dangers. Aren't those cases at odds with the cases? I can't hear. There are cases we have that seem to say that the prison administrators may base their actions on potential dangers and not necessarily on dangers which they have specifically faced in the past. Aren't those cases at odds with the case you cited before you just sat down? I don't think so, Your Honor. Herline involved explicit lyrics, a ban on inmates having cassette tapes that had explicit lyrics. It didn't involve the kind of one- I'm sorry, I can't hear you. Herline involved a ban on inmates having cassette tapes with explicit lyrics. It didn't involve the kind of family communication that we have here, which the Supreme Court in 2014 in the case McClellan v. Coakley recognized that one-on-one communication occupies a special place in the First Amendment hierarchy, and when the government burdens that type of communication, that is particularly egregious and needs a more specialized kind of review. And Murchison involved a particular issue of a particular publication. It wasn't the kind of blanket ban on all letters or even all magazines, something like that. It was one particular issue of a magazine that the warden had found advocated for violence. So in both of those cases, somebody had made a determination that the communications at issue were disruptive or at least could potentially be disruptive. Here there are innocuous letters going back and forth between Mrs. Simpson and her son on family matters and on the son's ability to rehabilitate into the community after his release. It's not the same kind of communication that was at issue in either Murchison or Herline. I guess I just wanted to close by saying that the ban really harmed the Simpsons' ability to reunite as a family, which there was undisputed testimony on. There was a significant First Amendment burden here. And there was, if I may finish, there was no evidence at trial. Not only was there no evidence of no contraband, there was affirmative evidence that there had been no contraband. And so in light of that, the district court should have done a more thorough review. What was the damage claim? It's essentially nominal damages, Your Honor. It was just for the cost of the postcards. And how is plaintiff at standing for an injunction? Well, Trey Simpson is still on probation. It's possible that he could go back to Cape Girardeau County. And we never got there because Well, then we have to take into account the March 2014 policy change, which hasn't been briefed. If that's your claim for standing, it's reentry into custody, right? Your Honor, we would ask that this court reverse and remand for further proceedings on that issue. But you have to have standing. That's jurisdictional. We do that. Your Honor, we think that the Simpson family, Mrs. Simpson, still has standing because her son is likely to go back to Cape Girardeau County Jail. Even at this point. Thank you. Thank you, Your Honor. Thank you. Thank you very much, counsel. Case is submitted.